UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL DARNELL TURNER                                CIVIL ACTION

VERSUS                                                NO: 17-4210

BP EXPLORATION &                                      SECTION: "J"(2)
PRODUCTION INC, ET AL.

## ORDER & REASONS

Before the Court are two motions filed by Defendants, BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. (collectively "BP"):[1] a *Daubert Motion to Exclude the General Causation Opinions of Plaintiff's Expert, Dr. Jerald Cook* **(Rec. Doc. 62)** and a *Motion for Summary Judgment* **(Rec. Doc. 63)**. Plaintiff, Michael Darnell Turner, opposes both (Rec. Docs. 65 & 64, respectively). Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that both motions should be granted.

## FACTS AND PROCEDURAL BACKGROUND

The instant action is a "B3" case arising out of the 2010 Deepwater Horizon ("DWH") oil spill in the Gulf of Mexico. B3 cases involve "claims for personal injury and wrongful death due to exposure to oil and/or other chemicals used during the oil spill response (e.g., dispersant)." *See In re Oil Spill by Oil Rig "Deepwater Horizon"*

---

[1] Halliburton Energy Services, Inc., Transocean Deepwater, Inc., Transocean Holdings, LLC, and Transocean Offshore Deepwater Drilling, Inc. join in the Daubert Motion and Motion for Summary Judgment.

1

*in Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2021 WL 6053613, at *10 (E.D. La. Apr. 1, 2021). These cases were originally part of a multidistrict litigation ("MDL") pending in this Court. During the course of the MDL proceedings, this Court approved the Deepwater Horizon Medical Benefits Class Action Settlement Agreement. *Id.* at *2. The B3 plaintiffs either opted out of the class action settlement agreement or were excluded from its class definition. *Id.* at *10 n.3.

Plaintiff, Michael Darnell Turner, was employed in the DWH oil spill response as a beach cleanup worker, picking up oil, tar balls, and oil-covered debris from beaches as well as pressure washing booms in the areas of Gulf Shores, Theodore, and Dauphin Island, Alabama for approximately nineteen months. This work, Turner alleges, exposed him to crude oil and chemical dispersants which caused Plaintiff to develop hypertension, acute renal insufficiency, chronic kidney disease stage III, hematuria, nephrotic range proteinuria, chest pain, frontoparietal cerebrovascular accident, stroke, headaches, blindness, obstructive sleep apnea, shortness of breath, wheezing, depression, abdominal pain, diarrhea, nausea, vomiting, dizziness, decreased sense of smell, facial pain or sinus pain, nasal congestion/discharge, throat irritation, skin blistering, boils, skin dryness and flaking, inflammation, redness, swelling, itching, peeling, and scaling. (Rec. Doc. 62-3).

In the case management order for the B3 bundle of cases, this Court noted that, to prevail, "B3 plaintiffs must prove that the legal cause of the claimed injury or illness is exposure to oil or other chemicals used during the response." 2021 WL 6053613, at *11. The Court further observed that the issue of causation "will likely

be the make-or-break issue of many B3 cases," which "will require an individualized inquiry." *Id.* Here, Turner relies on Dr. Jerald Cook to provide expert testimony as to general causation. (Rec. Doc. 62-4). Dr. Cook is a retired Navy physician with a master's degree in environmental toxicology and a fellow of the American College of Occupational and Environmental Medicine. (*Id.* at 5). He is board certified in occupational medicine, public health, and general preventative medicine. (*Id.*). Dr. Cook's report is an omnibus, non-case specific general causation expert report that has been used by many B3 plaintiffs. (Rec. Doc. 62-1, at 3). It mentions no plaintiff by name, including Turner, and it does not address any specific plaintiff's work on the spill response or the nature, duration, or type of exposure any plaintiff had to any particular toxin. *See generally* (Rec. Doc. 62-4). Further, in the report, Dr. Cook evaluates four categories of injuries or disease to see whether they could be caused by exposure to crude oil or dispersants. (*Id.*). Dr. Cook concluded that three of the categories of injury – respiratory, dermal, and ocular – can result from exposure to such. (*Id.*).

Now, BP has filed the instant *Daubert Motion to Exclude the General Causation Opinions of Dr. Cook* and Motion *for Summary Judgment* premised on the Court's granting of BP's Motion to Exclude. The Court will address each motion in turn.

## DAUBERT MOTION

**I.  LEGAL STANDARD**

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert may testify if: (1) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the expert's testimony "is based on sufficient facts or data"; (3) the expert's testimony "is the product of reliable principles and methods"; and (4) the principles and methods employed by the expert have been reliably applied to the facts of the case. Fed. R. Evid. 702. The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Both scientific and nonscientific expert testimony are subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment of "whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). When expert testimony is challenged under *Daubert*, the party offering the expert's testimony bears the burden of proving its reliability and relevance by a preponderance of the evidence. *Moore v. Ashland Chem. Co.,* 151 F.3d 269, 276 (5th Cir. 1998).

The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). A number of nonexclusive factors may be relevant to the reliability analysis, including: (1) whether the

technique at issue has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has considerable leeway in determining how to test an expert's reliability.").

## II. DISCUSSION

To begin, BP points out that two other Sections of this Court have excluded Dr. Cook's expert report in similar B3 cases. [2] (Rec. Doc. 62-1, at 1). BP argues that in this case, the Court should exclude Dr. Cook's opinions for the same reasons. (*Id.*). Judge Africk identified four primary bases for which Dr. Cook's general causation opinions were unreliable, and Judge Ashe found that just one of these four reasons was substantial on its own to permit exclusion, Dr. Cook's failure to identify a harmful dose of exposure necessary to cause the plaintiff's specific medical condition.[3]

---

[2] Dr. Cook's latest report, used in Judge Ashe's cases and the ones presented to this Court, is allegedly "substantially improved," but BP contests this argument and finds the report is still unreliable and inadmissible for the same reasons found in Judge Africk's Order & Reasons.

[3] *See Novelozo v. BP Expl. & Prod.*, No. 13-1033, 2022 WL 1460103 (E.D. La. May 9, 2022) (Africk, J.); and *Murphy v. BP Expl. & Prod.*, No. 13-1031, 2022 WL 1460093 (E.D. La. May 9, 2022) (Africk, J.); *Johns v. BP Expl. & Prod. Inc.*, No. 17-3304, 2022 WL 1811088 (E.D. La. June 2, 2022) (Ashe, J.); *Johnson v. BP Expl. & Prod. Inc.*, No. 17-3308, 2022 WL 1811090 (E.D. La. June 2, 2022) (Ashe, J.); *Macon v. BP Expl. & Prod. Inc.*, No. 17-3548, 2022 WL 1811135 (E.D. La. June 2, 2022) (Ashe, J.);

5

Specifically, Judge Ashe found that Dr. Cook had failed to identify a "particular chemical" or the "level of exposure to any such chemical as would be necessary to cause the specific symptoms . . . that is to say, the dose necessary to cause the reported reaction." *Johns*, 2022 WL 1811088, at *5. Here, the Court begins with the issue both Judge Africk and Ashe determined merited exclusion of Dr. Cook's expert testimony: whether his report identifies a particular chemical or the level of exposure to any such chemical as would be necessary to cause Turner's specific adverse health conditions.

"'Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are *minimal* facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) (citing *Wright v. Willamette Industries, Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996)) (emphasis added). In a subsequent toxic tort case, the Fifth Circuit, applying the above standard, held that an expert's testimony "[d]id not establish general causation" because the expert "provide[d] no clue regarding what would be a harmful level of [chemical] exposure." *Seaman v. Seacor Marine*, 326 F. App'x 721, 726 (5th Cir. 2009). Therefore, B3 Plaintiffs in these toxic tort cases "must prove, at a minimum, that exposure to a certain level of a certain substance for a certain period of time can cause a particular condition in the general population." *Williams v. BP Expl. & Prod.*, No. 18-9753, 2019 WL 6615504, at *8 (E.D. La. Dec. 5, 2019) (citing *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007)).

---

*Murray v. BP Expl. & Prod. Inc.*, No. 17-3582, 2022 WL 1811138 (E.D. La. June 2, 2022) (Ashe, J.); *Street v. BP Expl. & Prod. Inc.*, No. 17-3619, 2022 WL 1811144 (E.D. La. June 2, 2022) (Ashe, J.).

Further, in a BELO case,[4] the Fifth Circuit upheld the exclusion of a plaintiff's expert because he "was unable to answer questions regarding how much time [the plaintiff] spent scooping up oil, how, where, or in what quantity Corexit was used, how exposure levels would change once substances were diluted in seawater, or how [the plaintiff's] protective equipment would affect exposure." *McGill v. BP Expl. & Prod., Inc.*, 830 F. App'x 430, 433 (5th Cir. 2020). However, the court went on to reason that the general causation expert need not determine the precise level of exposure, but he must, at least, analyze the plaintiff's probable exposure level. *Id.* (citing *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661 (5th Cir. 1999), and *Clark v. Kellogg Brown & Root, L.L.C.*, 414 F. App'x 623 (5th Cir. 2011) in which the experts engaged in analysis of the plaintiff's workspace to determine a probable exposure level). Accordingly, here, to be reliable and, thus admissible, Dr. Cook's report must, at a minimum, analyze Turner's probable level of exposure.

BP argues that Dr. Cook's failure to identify the harmful level of exposure for any chemical or any medical condition is the most fundamental deficiency. (Rec. Doc. 62-1, at 17). Because the law requires an expert to identify the harmful level of exposure for each chemical and each condition, BP contends that this failure is especially problematic because Dr. Cook is investigating multiple allegedly toxic chemicals, and Turner is alleging multiple adverse health conditions. (*Id.* at 10–11).

---

[4] "[B]oth BELO plaintiffs and B3 plaintiffs must prove that the legal cause of the claimed injury or illness is exposure to oil or other chemicals used during the response . . . [n]otably, experience has shown that causation is a critical element—if not the critical element—in BELO cases, and therefore will likely be the make-or-break issue for many B3 cases as well. Additionally, the issue of causation in these toxic tort cases will require an individualized inquiry." 2021 WL 6053613, at *11.

Judge Ashe, in his recent opinions, emphasized that Dr. Cook's report failed to include even a single mention of a specific chemical. *See, e.g.*, *Johns*, 2022 WL 1811088, at *5. Instead, Judge Ashe found that Dr. Cook's report "refers generally to oil, dispersants, and volatile organic compounds," and he "never identifies any particular chemical to which [the plaintiff] was exposed, much less the level of exposure to any such chemical as would be necessary to cause the specific symptoms of which [the plaintiff] complains – that is to say, the dose necessary to cause the reported reaction." *Id.* Because Plaintiff used the same report by Dr. Cook here, Dr. Cook's report fails to identify a single specific chemical.

Turner admits that "Judge Ashe's conclusion is factually correct in that Dr. Cook did not rely on quantitative exposure data in reaching his general causation opinions." (Rec. Doc. 65, at 2). Turner explains that the plaintiffs in Judge Ashe's cases "could have done a much better job of articulating for Judge Ashe that Dr. Cook did not utilize a quantitative 'dose' because the current, peer reviewed and published epidemiological literature on BP spill workers and on which Dr. Cook relies does not employ the traditional Bradford Hill 'dose-response' criteria." (*Id.*). In an attempt to articulate better than past plaintiffs why Dr. Cook does not identify quantitative exposure data in his report, Turner contends that Dr. Cook and the scientific community use measurement/ effect criteria like the "exposure-response," "ever/never exposed," and "job exposure matrix" because BP avoided or prevented the recording of exposure and dose data. (*Id.*). Turner argues that Dr. Cook's failure to identify a particular chemical or the level of exposure to any such chemical as would be

8

necessary to cause the specific symptoms is not a bar to finding that his methodology is proper and reliable under *Daubert*. (*Id.*). However, while this argument may work in response to BP's contention that Dr. Cook did not follow the proper methodology, it does prevail in response to BP's assertion that Dr. Cook does not identify the harmful level of exposure for any chemical or any medical condition. As the Fifth Circuit has held, identification of the harmful level of exposure to a chemical is one of the "minimal facts necessary to sustain the plaintiff's burden in a toxic tort case." *Allen*, 102 F.3d at 199.

Turner argues that the reason neither he nor any other plaintiff can present this specific quantitative data is due to BP's failure to act during the spill to preserve evidence of the workers' actual total exposure to specific chemicals in the weathered oil. (Rec. Doc. 65-17, at 1). In reply, BP asserts that Turner's argument misses the mark because the general causation analysis "permits the expert to consult the universe of epidemiological and toxicological literature that has studied the constituents at issue," and "[i]t does not depend upon environmental sampling data taken as part of the incident." (Rec. Doc. 62-1, at 10). "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Knight*, 482 F.3d at 35. Therefore, the fundamental question in this general causation inquiry is whether the chemicals, weathered oil, and dispersants to which Turner alleges he was exposed can cause the conditions he alleges. Dr. Cook's report fails to identify a single chemical and, instead, refers

9

generally to oil, dispersants, and volatile organic compounds. Moreover, even if Dr. Cook's report were to identify a specific chemical present in the crude oil, weathered crude oil, or dispersants, his report fails to establish a harmful level of any chemical to the general population. Thus, Dr. Cook's report fails to satisfy Fifth Circuit's minimal fact required: scientific knowledge of the harmful level of exposure to a chemical. As Dr. Cook even points out himself, "[t]here is a toxicology maxim that the dose determines the poison." (Rec. Doc. 62-4, at 27). Yet, Dr. Cook fails to identify the dose of any such chemical that would result in the adverse health effects contained in his report, and his report is therefore unreliable and inadmissible.

Next, as a last-ditch attempt to save his case, Turner appears to make a spoliation argument despite stating in a footnote, "[w]hile not relevant for this motion, Plaintiffs inform the Court that they will be filing spoliation-related motions." (Rec. Doc. 65, at 2 n.3). However, the Court finds that spoliation is relevant to Turner's argument in this motion so will address it now.

"Spoliation is the destruction or the significant and meaningful alteration of evidence." *United States v. E.R.R. LLC*, No. 19-2340, 2020 WL 4732218, at *3 (E.D. La. Aug. 14, 2020). Spoliation also includes "the failure to preserve property for another's use in pending or reasonably foreseeable litigation." *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 799 (N.D. Tex. 2011) (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)). However, destroying, altering, or failing to preserve does not necessarily mean that the party has engaged in sanction-worthy spoliation because "[a] spoliation claim has three elements: (1) the spoliating

10

party must have controlled the evidence and been under an obligation to preserve it at the time of destruction; (2) the evidence must have been intentionally destroyed; and (3) the moving party must show that the spoliating party acted in bad faith." *Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 F. App'x 565, 574 (5th Cir. 2020). In the Fifth Circuit, "an adverse inference against the spoliator or sanctions against the spoliator [is permitted] only upon a showing of 'bad faith' or 'bad conduct.'" *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (citing *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005)).

Turner argues that BP had a duty to take and preserve dermal monitoring and biomonitoring of oil spill response workers in addition to the air monitoring conducted by BP. (Rec. Doc. 65-17, at 2). Assuming, *arguendo*, that BP had a duty to preserve results of dermal and biological monitoring of the oil spill response workers, Plaintiff must additionally prove that BP acted in bad faith when it failed to do so. "Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Guzman*, 804 F.3d at 713 (citations omitted). In *Consolidated Aluminum Corp. v. Alcoa, Inc.*, the court explained, "[f]or the spoliator to have a 'culpable state of mind,' it must act with fraudulent intent and a desire to suppress the truth." 244 F.R.D. 335, 344 (M.D. La. 2006). Additionally, in *Tammany Parish Hospital Service District No. 1 v. Travelers Property Casualty Co. of America*, the court found that "[t]he theory of spoliation of evidence refers to an intentional destruction of evidence for [the] purpose of depriving opposing parties of its use." 250

11

F.R.D. 275, 277 (E.D. La. 2008) (citations omitted). Moreover, in *Thomas v. Tangipahoa Parish School Board*, the court explained:

> The Fifth Circuit has not further defined "bad faith" in the spoliation context, but has defined it under Louisiana law as
>
> [t]he opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead and deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive. The term bad faith means more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives.

No. 14-2814, 2016 WL 3542286, at *2 (E.D. La. June 29, 2016) (quoting *Industrias Magromer Cuerosy Pieles S.A. v. Louisiana*, 293 F.3d 912, 922 (5th Cir. 2002)).

The question before this Court is whether BP acted with fraudulent intent when it did not take dermal and biomonitoring of the oil spill response workers for the purpose of suppressing the truth and depriving opposing parties of its use. Turner argues that BP's actions, or inactions, show that BP intentionally failed to act during the oil spill cleanup to preserve evidence of the workers' actual total exposure to specific chemicals in the weather oil. (Rec. Doc. 65-17, at 1). Turner contends that BP knew that dermal monitoring and biomonitoring of the workers was needed, but it did nothing to act on that need. (*Id.* at 1–2). Instead, Turner asserts, BP continued to conduct only monitoring for airborne hazards to the workers. (*Id.* at 2). To support this argument, Turner cites to various emails. (*Id.*). First, Turner cites to a July 2, 2010 email from National Institute of Occupational Safety and Health ("NIOSH") Deputy Director Kitt to Dr. Richard Heron, BP's Health/Medical Lead for the BP spill response. (Rec. Doc. 65-19, at 2–3). Within this email, NIOSH details their plan to

extend response worker exposure and quantification by incorporating biomonitoring "as part of the expanded [health hazard evaluation ("HHE")] efforts BP has asked NIOSH to do." (*Id.* at 3). NIOSH states that it is developing protocols to use as a path forward with biomonitoring that it will share with BP once the draft is complete. (*Id.*).

After detailing the proposed protocols, NIOSH states that it will need the support of BP to meet implementation hurdles and asks for BP's thoughts. (*Id.*). Dr. Heron then forwards this email to BP's Health Safety, and Environment ("HSE") Technical Team with the request that they submit their comments on the proposed protocol, but he asks them not to circulate it. (*Id.* at 1). Turner contends that Dr. Heron's asking the HSE Team not to circulate the proposed protocol shows that BP acted in bad faith. (Rec. Doc. 65-17, at 3). However, at BP's Rule 30(b)(6) deposition, BP's representative, Dr. Dutton stated that NIOSH ended up not conducting this proposed biomonitoring of spill response workers, but he did not know why. (Rec. Doc. 65-18, at 112). In fact, in his deposition, Dr. Dutton states that BP asked NIOSH to come in and conduct HHE's, but "for whatever reason, NIOSH [ ] decided not to expand the HHE's by doing the biomonitoring. You'd have to ask them. I don't know why." (*Id.* at 117). Dr. Dutton testified that the "support" NIOSH was looking for from BP was logistical support. (*Id.* at 119). Specifically, BP's "primary role through the HHE process was providing logistical support to HHE members [such as access to the site, transportation, and sleeping arrangements]. We did not tell them what to sample for or how to sample it . . . or how to analyze it." (*Id.*). While perhaps BP could have done more to conduct dermal monitoring and biomonitoring, the Court finds

13

that Turner has not met his burden to show that BP acted with a culpable state of mind to suppress the truth and deprive future parties of this data.

## MOTION FOR SUMMARY JUDGMENT

### I. LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56); *see Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts

to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See id.* at 325; *Little*, 37 F.3d at 1075.

## II. DISCUSSION

As in the cases decided by both Judge Africk and Judge Ashe, cited above, because Dr. Cook's general causation opinions are excluded, Defendants are entitled to summary judgment dismissing Turner's claims. Turner has no other medical expert for general causation, and expert testimony is required. Therefore, Turner has failed to create a genuine issue of material fact with respect to his claims that his injuries were caused by exposure to oil and dispersants.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' *Motion to Exclude the Causation Opinion of Plaintiff's Expert, Dr. Jerald Cook* (Rec. Doc. 62) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' *Motion for Summary Judgment* (Rec. Doc. 62) is **GRANTED.**

**IT IS FURTHER ORDERED** that all claims of Plaintiff, Allen "Bradley" Turner, against Defendants, BP Exploration & Production Inc.; BP America Production Company; BP p.l.c.; Halliburton Energy Services, Inc.; Transocean Deepwater, Inc.; Transocean Holdings, LLC; and Transocean Offshore Deepwater Drilling, Inc., are **DISMISSED with prejudice.**

**IT IS FURTHER ORDERED** that Defendants' *Motions for Leave to File Reply* **(Rec. Docs. 71 & 72)** are **DENIED as moot.**

New Orleans, Louisiana, this 29th day of June, 2022.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE